# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

—o0o—

| | |
|---|---|
| RAYMOND JIMENEZ, | ) 1:02 CV 05871 LJO JMD (HC) |
| Petitioner, | ) FINDINGS AND RECOMMENDATION |
| v. | ) REGARDING PETITION FOR WRIT OF |
| | ) HABEAS CORPUS |
| A.A. LAMARQUE, Warden, | ) [Document #1] |
| Respondent. | ) |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. This action has been referred to this court pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72-302.

PROCEDURAL HISTORY

Petitioner is currently in the custody of the California Department of Corrections pursuant to a judgment of the Superior Court of California, County of Kings, following his conviction on October 2, 1998, by jury trial on two counts of first degree murder with multiple-murder special circumstances. In addition, Petitioner was found to have personally used a firearm in the

commission of the offenses. Petitioner was sentenced to consecutive life terms without the possibility of parole, plus a four-year gun use enhancement for each term.

Petitioner and a co-defendant both appealed their convictions to the California Court of Appeal, Fifth Appellate District (hereinafter "5th DCA"). On January 31, 2001, the 5th DCA affirmed Petitioner's conviction and sentence. See Ex. D to Respondent's Answer.[1]

Petitioner timely appealed the decision of the 5th DCA to the California Supreme Court, which denied review on April 17, 2001. The California Supreme Court's denial of review constitutes exhaustion of Petitioner's state court remedies for purposes of the present Petition.

On July 18, 2002, Petitioner filed the instant Petition for writ of habeas corpus. Respondent submitted its answer on April 8, 2003.

## FACTUAL BACKGROUND

The Court adopts the facts as summarized by the 5th DCA in its opinion dated January 31, 2001:

> The shootings occurred at a birthday party in Corcoran during the early morning of July 23, 1997. The partygoers, including Jimenez and Nevarez, had spent the past several hours socializing, listening to music, playing cards, drinking beer, and smoking marijuana. By the end of the party, the were "buzzing pretty hard."
> Jimenez and Nevarez each had a gun under his shirt, tucked in the waistband of his pants: Jimenez had a .380-caliber Davis pistol, and Nevarez had a nine-millimeter TEC 9 semiautomatic assault weapon. The TEC 9 belonged to Nevarez's older brother, who had bought it a few months before from Andrew Ramirez. Ramirez was also at the party. He was an associate or "wannabe" of the Bulldogs, a Fresno area street gang, and let it be known at the party that he "ran with the dogs."
> Shortly before the shootings, Ramirez got into an argument with Daniel Marquez, a 16-year-old who by then was very drunk. Marquez referred to Ramirez as a "bull frog." Ramirez found the remark disrespectful and exchanged words with Marquez, threatening to "fuck him up." Ramirez did not act on his threat, but Jimenez and Nevarez, who both overheard the exchange, got "all pumped up" and reached for their guns. Ramirez calmed them down and convinced them for the moment to "let it ride."
> After a while, Daniel's older brother David returned to the party. Ramirez told him what had happened. David apologized and attempted to leave with Daniel. Daniel resisted but eventually went along outside to the car of a friend who had offered to drive them home. Jimenez and Nevarez, together with several other people, followed the Marquez brothers to the car. Nevarez pushed Daniel, and another argument ensued. Several people interceded, including Ramirez, and eventually they managed to calm things down again, or so it appeared. Daniel and David got into the car to leave, and the assembled group began to disperse. Just then Jimenez and Nevarez drew their guns and began shooting into the car. They fled afterward and were arrested about a month later at the Mexican border. The two guns eventually were found buried in a lot behind the home of Ramirez's grandmother.

---

[1] All subsequent exhibit references are to the exhibits in Respondent's answer, unless otherwise noted.

David was shot in the back 13 times and died at the scene from the loss of blood caused by perforating wounds to his heart, lungs, and liver. Daniel died the next day from a single gunshot wound to the right side of his head.

Police found numerous nine-millimeter shell casings in the area around the car, a single .380-caliber shell casing, and a .380-caliber cartridge. All the bullets recovered from the victims' bodies were nine millimeters in diameter; none of them was consistent with a .380-caliber bullet. Jimenez would later tell police he fired the .380-caliber pistol once, probably into the ground, and then it jammed when he pulled the trigger a second time.

At the time of death, David Marquez had a blood alcohol level of .14 and tested positive for the presence of methamphetamine. Daniel had a blood alcohol level of .22 but no sign of drugs.

## DISCUSSION

I. Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 fn. 7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. In addition, the conviction challenged arises out of the Fresno County Superior Court, which is located within the jurisdiction of this Court. 28 U.S.C. § 2254(a); 2241(d). Accordingly the Court has jurisdiction over this action.

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997), *cert. denied*, 522 U.S. 1008 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), *quoting* Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir. 1996), *cert. denied*, 520 U.S. 1107 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320 (1997) (holding AEDPA only applicable to cases filed after its enactment). The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

II. Standard of Review

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a state court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C . § 2254(a).

3

cd

The instant petition is reviewed under the provisions of the AEDPA. Lockyer v. Andrade, 538 U.S. 63, 70 (2003). Under the AEDPA, a petition for habeas corpus will not be granted unless the adjudication in question "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d); *see* Lockyer, 538 U.S. at 70-71; Williams, 529 U.S. at 413.

As a threshold matter, this Court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71, *quoting* 28 U.S.C. § 2254(d)(1). In ascertaining "clearly established Federal law," the Court looks to the "holdings, as opposed to the dicta, of [Supreme Court] decisions as of the time of the relevant state-court decision." Id., *quoting* Williams, 592 U.S. at 412. "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Id.

Finally, this Court must consider whether the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law." Lockyer, 538 U.S. at 72, *quoting* 28 U.S.C. § 2254(d)(1). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 413; *see also* Lockyer, 538 U.S. at 72. "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413.

This Court may not issue the writ simply because in its independent judgment the state court decision applied clearly established federal law erroneously or incorrectly; for a writ to issue, 'that application must also be unreasonable." Id. At 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly

established federal law was 'objectively unreasonable." Id. At 409.

Petitioner has the burden of establishing that the decision of the state court is contrary to or involved an unreasonable application of United States Supreme Court precedent. Baylor v. Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996). Although only Supreme Court law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court decision is objectively unreasonable. *See* Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th cir. 1999).

AEDPA requires that this court give considerable deference to state court decisions. The state court's factual findings are presumed correct. 28 U.S.C. § 2254(e)(1). Moreover, we are bound by a state's interpretation of its own laws. Souch v. Schaivo, 289 F.3d 616, 621 (9th Cir. 2002), *cert. denied*, 537 U.S. 859 (2002), *rehearing denied*, 537 U.S. 1149 (2003).

III. Review of Petitioner's Claims

    A. Ground One: Peremptory Juror Exclusions

In his ground for relief, Petitioner claims the trial court erroneously denied co-defendant's motions under People v. Wheeler, 22 Cal.3d 258 (1978). Petitioner contends the prosecutor used peremptory challenges to systematically exclude Hispanic-American and female jurors in violation of his constitutional rights. He argues the trial court erred in failing to recognize that a prima facie case of discrimination had been established.

        1.    Factual Background

Toward the end of jury selection, [co-defendant] Nevarez made a Wheeler motion to dismiss the entire panel on the ground the prosecutor had used eight of eleven peremptory challenges to excuse women jurors, the majority of whom were Hispanic. (To that point, the defense had used seven of its eight peremptory challenges to excuse men, only one of whom was Hispanic.) The court responded:
> "Well, I'm not making a prima facie determination that, I'm not making any determination of [sic] a prima facie showing has been made. The majority of the jury panel is women. It's therefore not unusual that a majority of those excused would be women.
> I would be curious as to People's reasons for excusing jurors [Nos. 56,66,57, and 30]."

All four of the jurors mentioned by the court were women, and two had Hispanic surnames. After the prosecutor explained her reasons for excusing these four, the court briefly discussed four other Hispanic jurors (both men and women) excused by the prosecution, citing in each case a reasonable if not obvious reason why the prosecution might have elected to dismiss them. The court then denied Nevarez's Wheeler motion insofar as it applied first to the exclusion of Hispanic jurors, and then to the exclusion of women.

Thus, this discussion covered eight of the prosecution's eleven peremptory challenges.

5

cd

The court did not ask the prosecutor to explain her excusal of the remaining three jurors: two women and a man.  We are concerned here only with the two women, jurors No. 43 and 45.

Jury selection continued and the prosecution challenged one more juror, again a woman, before the process was completed (save for the selection of two alternate jurors).  Nevarez, this time joined by Jimenez, renewed his Wheeler motion.  The court questioned the prosecutor briefly about her reason for excusing this last juror, juror No. 13.  It accepted her proffered explanation and denied the motion a second time.  The jury as finally constituted consisted of seven women and five men.  And both alternates were women.

_____

2.     Clearly Established Supreme Court Law

Evaluation of allegedly discriminatory peremptory challenges to potential jurors in federal and state trials is governed by the standard articulated by the United States Supreme Court in Batson v. Kentucky, 476 U.S. 79, 89 (1986).

In Batson, the United States Supreme Court set out a three-step process in the trial court to determine whether a peremptory challenge is race-based in violation of the Equal Protection Clause.  Purkett v. Elem, 514 U.S. 765, 767 (1995).  First, the defendant must make a *prima facie* showing that the prosecutor has exercised a peremptory challenge on the basis of race.  Id.  That is, the defendant must demonstrate that the facts and circumstances of the case "raise an inference" that the prosecution has excluded venire members from the petit jury on account of their race.  Id.

If a defendant makes this showing, the burden then shifts to the prosecution to provide a race-neutral explanation for its challenge.  Id.  At this step, "the issue is the facial validity of the prosecutor's explanation.  Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral."  Hernandez v. New York, 500 U.S. 352, 360 (1991).  Finally, the trial court must determine if the defendant has proven purposeful discrimination.

3.     State Court Review

This claim was first presented on direct appeal to the 5th DCA.  The 5th DCA denied the claim on January 31, 2001, in a reasoned opinion.  See Ex. D.  The claim was then presented to the California Supreme Court in a petition for review; the petition was summarily denied on April 17, 2001.  See Ex. G.  The California Supreme Court, by its "silent order" denying review is presumed to have denied the claims presented for the same reasons stated in the opinion of the

1  5th DCA. Y1st v. Nunnemaker, 501 U.S. 797, 803 (1991).

2  The 5th DCA first found that Petitioner's claim was procedurally barred as Petitioner had
3  not timely objected to the jury selection process at trial. Ex. D at 9-10.

4  In addition, the 5th DCA found that – contrary to the Petitioner's argument – the second
5  Wheeler motion did *not* call into question all of the prosecutor's peremptory challenges, but only
6  those challenges brought after the court had denied the first Wheeler motion. As such, the failure
7  of the prosecutor to provide an explanation for excusing jurors No. 43 and 45 was not error per
8  se, particularly in light of the fact that the trial court had already made an express finding that the
9  defense had failed to state a prima facie case as to the earlier challenges. Ex. D at 9.

10  The 5th DCA went on to find that the trial court had acted within its discretion in finding
11  no prima facie case had been made with respect to the first Wheeler motion. The court examined
12  the record and found that the defense had failed to make a showing adequate to support its claim
13  of prima facie discrimination, in that its only "showing" was that eight of the eleven excused
14  jurors were women. Given this, and further given that roughly half of the prospective jurors were
15  women, that defense challenges disproportionately targeted men, thus further increasing the
16  proportion of women in the jury pool, and that over half of the jurors ultimately selected were
17  women, the court found adequate support for the trial court's conclusion that a prima facie case
18  had not been established. Ex. D at 10-11.

19  Because a prima facie case was not established, the 5th DCA found it unnecessary to
20  review the adequacy of the prosecutor's justifications. Ex. D at 11.

21      4.    Analysis

22          i.    Procedural Default

23  Because Petitioner failed to timely object to the prosecutions peremptory
24  challenges of jurors 43 and 45, Petitioner's claim is barred. Federal courts "will not review a
25  question of federal law decided by a state court if the decision of that court rests on a state law
26  ground that is independent of the federal question and adequate to support the judgment."
27  Coleman v. Thompson, 501 U.S. 722, 729 (1991); LaCrosse v. Kernan, 244 F.3d 702, 704 (9th
28  Cir. 2001). If the court finds an independent and adequate state procedural ground, "federal

habeas review is barred unless the prisoner can demonstrate cause for the procedural default and actual prejudice, or demonstrate that the failure to consider the claims will result in a fundamental miscarriage of justice." Noltie v. Peterson, 9 F.3d 802, 804-805 (9th Cir. 1993); Coleman, 501 U.S. at 750; Park v. California, 202 F.3d 1146, 1150 (9th Cir. 2000).

Here, the 5th DCA on direct review held that Petitioner had waived his claim by failing to object at trial. Ex. D at 9-10. Thus, the Court of Appeal applied the contemporaneous objection bar. This Court finds that the contemporaneous objection rule is applied independent of federal law. See Vansickel v. White, 166 F.3d 953, 957-58 (9th Cir. 1999) (recognizing and applying California's contemporaneous objection rule in affirming denial of a federal petition on the ground of procedural default); Bonin v. Calderon, 59 F.3d 815, 842-43 (9th Cir. 1995) (sustaining the state court's finding of procedural default where defendant failed to make any objection at trial). This Court further finds that the contemporaneous objection rule is also "adequate." California Courts have consistently applied the contemporaneous objection rule. Melendez v. Pliler, 288 F.3d 1120, 1125 (9th Cir. 2002) ("We held more than twenty years ago that the rule is consistently applied when a party has failed to make any objection to the admission of evidence.") (*citing* Garrison v. McCarthy, 653 F.2d 374,377 (9th Cir. 1981); Vansickel v. White, 166 F.3d at 957-58; Bonin v. Calderon, 59 F.3d at 842-43).

Petitioner has made no attempt to demonstrate cause and prejudice or that a miscarriage of justice will result should the Court not consider the claim. Accordingly, the Court rejects Petitioner's claim as procedurally barred.

                ii.      Review on the Merits

Even were Petitioner's claim not barred, he would still not be entitled to relief, as the state courts' denial of his Equal Protection claim is consistent with Supreme Court precedent. According to Batson, defense counsel must first demonstrate that the facts and circumstances of the case raise an inference that the prosecution excluded jurors on account of some suspect classification. 476 U.S. at 89. This co-defendant's counsel failed to do. The only point co-defendant's counsel raised was that the two jurors in question were female. But this alone does not amount to a *prima facie* Equal Protection case. See Williams v. Woodford, 385 F.3d 567,

583-584 (9th Cir. 2004) ("Although a pattern of strikes against African-Americans provides support for an inference of discrimination...[Petitioner] must point to more facts than the number of African-Americans struck to establish such a pattern."). As found by the trial court and affirmed by the appellate court, defense counsel's assertion that the prosecution was systematically excluding female jurors was unfounded. Co-defendant's counsel did not point to any facts or circumstances such as the prospective juror's individual characteristics, the nature of the prosecutor's voir dire, or the prospective juror's answers to questions, which would give rise to an inference of discrimination. Merely stating that an excused juror is of a particular race or gender does not raise an inference of discriminatory purpose. Id. As noted by the state courts, at least half if not the majority of the jury panel were women. RT-JVD 213, Ex. D at 10. And the ratio of women to men was increased due to the fact that most of co-defendant's challenges were directed at men. Ex. D at 10-11. Moreover, the eventual jury panel consisted of seven women and five men, with two female alternate jurors. Ex. D at 8. This was ample evidence upon which to support the trial court's finding that no prima facie case had been made. See Hayes v. Woodford, 301 F.3d 1054, 1081 (9th Cir. 2002) (presence of African-American jurors on the eventual panel is relevant factor in assessing genuineness of prosecutor's race-neutral reasons); Turner v. Marshall, 1212 F.3d 1248, 1254 (9th Cir. 1997) (same); United States v. Bishop, 959 F.2d 820, 827 (9th Cir. 1992) (same).

     5.     Conclusion

Petitioner has failed to demonstrate that the state court rejection of his claim was contrary to, or an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or a decision that was based on an unreasonable determination of the facts in light of the evidence presented. See 28 U.S.C. § 2254(d). Accordingly, this claim should be denied.

     B.     Ground Two: Failure to Give Sua Sponte Accomplice Instruction[2]

---

[2] Respondent notes that Petitioner did not raise this claim in his Petition for Review before the California Supreme Court. Answer at 20, fn. 17. Arguably, Petitioner's claim is barred for failure to exhaust state law remedies. However, the parties have not briefed this issue, and because the Court rejects Petitioner's claim on the merits, it is unnecessary to address the exhaustion issue.

In his second claim for relief, Petitioner argues that the trial court's decision not to give jury instructions regarding the credibility of accomplice witness testimony violated his Constitutional right to due process as guaranteed by the Fourteenth Amendment.

1.     Factual Background

During the trial, defendants requested accomplice instructions as to witness Ramirez, who had supplied the gun used by co-defendant Nevarez.  The request was subsequently withdrawn.  Nonetheless, at the close of trial, the following discussion took place regarding the accomplice instruction:

> THE COURT: Originally there had been a request for instruction on accomplice testimony as, as to, I assume, as to witness Ramirez.  Although I understand that that instruction has now been withdrawn, if appropriate, the Court has a sua sponte duty to instruct with the accomplice instructions.
> My recollection of the testimony is that Mr. Ramirez was arrested for, among other things, conspiracy to commit the murders of the Marquez'.  But I don't recall any evidence in this trial that would indicate that Mr. Ramirez is liable for prosecution; is or was the, subject to prosecution for that crime.
> Did I miss something?  Did anybody, did any witness testify that Ramirez shot or was in possession of the weapon shortly before the shooting?
> THE PROSECUTOR: There was no testimony in that regard, your Honor.
> THE COURT: Or gave words of encouragement or aided or abetted in some fashion?
> THE PROSECUTOR: There was no testimony as to Andrew Ramirez encouraging the defendants in any way.
> ...
> THE COURT: There was evidence that months prior he had delivered one or both guns.
> THE PROSECUTOR: Right, that he had delivered the one, the tec-9 to the family of Andrew Nevarez, but it was - -
> THE COURT: And that subsequently he, I guess he knew where the weapons were subsequent.
> THE PROSECUTOR: He saw or testified that he saw Mr. Nevarez, Andrew Nevarez with the gun subsequent to the transaction in April or May with the family.
> THE COURT: Okay.  All right, I won't be giving the accomplice instruction then....

2.     Clearly Established Supreme Court Law

As a preliminary matter, the court notes that an allegation of error in the jury charge under state law does not form a basis for federal habeas corpus relief.  Estelle v. McGuire, 502 U.S. 62, 67 (1991) ("We have stated may times that federal habeas corpus relief does not lie for errors of state law.").  To obtain federal collateral relief for errors in the jury charge, a petitioner must

1  show that the error so infected the entire trial that the resulting conviction violates Due Process.
2  Id. at 72. Additionally, individual instructions may not be judged in artificial isolation, but must
3  be considered in the context of the instructions as a whole and the trial record. Id. The court
4  must evaluate jury instructions in the context of the overall charge to the jury as a component of
5  the entire trial process. See United States v. Frady, 456 U.S. 152, 169 (1982), *citing* Henderson
6  v. Kibbe, 431 U.S. 145, 154 (1977).

7       For an omitted jury instruction to have violated due process, the omission must have "so
8  infected the entire trial that the trial cannot be relied on as having produced a just result."
9  Williams v. Vasquez, 817 F.Supp. 1443, 1478 (9th Cir. 1993), citing Henderson, 431 U.S. at 154.
10 A petitioner making such a due process challenge carries an "especially heavy" burden. Id.,
11 quoting Henderson, 431 U.S. at 155.

12      Even if it is determined that the instruction violated the petitioner's right to Due Process,
13 a petitioner can only obtain relief if the unconstitutional instruction had a substantial influence on
14 the conviction and thereby resulted in actual prejudice under Brecht v. Abrahamson, 507 U.S.
15 619, 637 (1993) (whether the error had a substantial and injurious effect or influence in
16 determining the jury's verdict); see also Hanna v. Riveland, 87 F.3d 1034, 1039 (9th Cir. 1996).
17 The burden of demonstrating that an erroneous instruction was so prejudicial that it will support
18 a collateral attack on the validity of a state court's judgment is even greater than the showing
19 required to establish plain error on direct appeal. Id Moreover, with respect to accomplice
20 instructions, the Ninth Circuit has held that the failure to give a *sua sponte* instruction on
21 accomplice credibility does not necessarily constitute plain error under Federal law. United
22 States v. Bosch, 914 F.2d 1239, 1247 (9th Cir. 1990); United States v. Busby, 484 F.2d 994, 997
23 (9th Cir. 1973), *cert. denied*, 415 U.S. 980 (1974).

24      3.    State Court Review
25      Petitioner's claim was first presented before the Fifth DCA, which rejected said claim.
26 The Fifth DCA first noted that, for purposes of the instructions, an accomplice is a person liable
27 to prosecution for the identical offense charged against the defendants. Ex. D at 11. To be liable
28 for the same offense, the witness would have to come under the definition of a "principal," which

includes all persons who either directly commit the offense, aid and abet in its commission, or, not being present, nonetheless advised and encouraged its commission. Ex. D at 11-12.

Petitioner argued that Ramirez was an accomplice because: (1) he sold the TEC 9 to Nevarez's brother several months prior to the shooting; (2) he had a motive to kill one of the victims (Daniel Marquez had insulted him at the party); (3) he fled the scene after the shootings; and (4) he gave conflicting accounts to police about where he was at the time of the shootings.

The state appellate court upheld the trial court's assessment that no *sua sponte* accomplice instructions were required under the circumstances. None of the arguments made by Petitioner and co-defendant demonstrated that Ramirez actually instigated, aided, or encouraged them to commit the crime. Ex. D at 12. There was no evidence that Ramirez understood that the TEC 9 would be used in this shooting months earlier when he sold it to Nevarez's brother. Id. Moreover, there was no evidence that either Ramirez or defendants harbored any animosity toward the Marquez brothers until shortly before the shootings, and there was evidence that Ramirez had attempted to calm down defendants rather than incite them. Id. Ramirez had testified that he was not nearby during the later argument between defendants and the Marquez brothers which led to the shooting. Petitioner's co-defendant argued that "Ramirez' lack of direct involvement in the shootings depends entirely on the credibility of his claim that he was around the corner urinating or walking away when the shots went off. If he was untruthful on these points, then it is likely that he was present when the shots went off, and that he directed the shootings." Ex. D at 13. The Fifth DCA found that, even if Ramirez were present at the car during the shooting, there was still no evidence he aided or instigated the shootings.

Because of the lack of evidence that Ramirez either directly participated in, aided and abetted, or instigated the shootings, the Fifth DCA held that the trial court was not required to give *sua sponte* accomplice instructions.

4.     Analysis

This Court finds Petitioner's claim to be without merit. First, the claim appears to allege an error of state law rather than a violation of Constitution or federal law, and is therefore not a proper matter for federal habeas review. Generally, issues of state law are not cognizable on

federal habeas. Estelle v. McGuire, 502 U.S. 62, 67 (1991) ("We have stated many times that 'federal habeas corpus relief does not lie for errors of state law.'"), *quoting* Lewis v. Jeffers, 497 U.S. 764, 780 (1990); Gilmore v. Taylor, 508 U.S. 333, 348-49 (1993) (O'Connor, J., concurring) ("mere error of state law, one that does not rise to the level of a constitutional violation, may not be corrected on federal habeas.").

Moreover, the appellate court ruled that trial judge's decision not to issue an accomplice instruction under the circumstances of this case was entirely correct under state law. Federal courts are bound by state court rulings on questions of state law. Oxborrow v. Eikenberry, 877 F.2d 1395, 1399 (9th Cir.), *cert. denied*, 493 U.S. 942 (1989). State courts are "the ultimate expositors of state law," and this court is "bound by the state's construction except when it appears that its interpretation is an obvious subterfuge to evade the consideration of a federal issue." Peltier v. Wright, 15 F.3d 860, 862 (1994), *quoting* Mullaney v. Wilbur, 421 U.S. 684, 691 (1995) (construing state court judgment). See also Melugin v. Hames, 38 F.3d 1478, 1482 (9th Cir. 1994) (construing state criminal statute). There is no evidence of subterfuge here.

However, a "claim of error based upon a right not specifically guaranteed by the Constitution may nonetheless form a ground for federal habeas corpus relief where its impact so infects the entire trial that the resulting conviction violates the defendant's right to due process." Hines v. Enomoto, 658 F.2d 667, 673 (9th Cir. 1981), *citing* Quigg v. Crist, 616 F.2d 1107 (9th Cir. 1980); see also Lisbena v. California, 314 U.S. 219, 236 (1941); Henry v. Kernan, 197 F.3d 1021, 1031 (9th Cir. 1999). In order to raise such a claim in a federal habeas corpus petition, the "error alleged must have resulted in a complete miscarriage of justice." Hill v. United States, 368 U.S. 424, 428 (1962).

Here, Petitioner has failed to demonstrate a due process violation. As explained by the state appellate court, the evidence presented at trial did not support a finding that Ramirez was an accomplice to the shooting such that the trial judge was required to issue accomplice instructions. Ex. D at 12-13. Even if accomplice instructions *were* warranted under state law, when viewed in light of the trial process in its entirety we cannot say that their omission had a substantial influence on the conviction such that the omission "so infected the entire trial that the trial

cannot be relied on as having produced a just result." Williams, 817 F.Supp. at 1478, citing Henderson, 431 U.S. at 154; see also Brecht, 507 U.S. 637. There is ample corroboration of Ramirez's testimony on the record. Both witness Silva and Petitioner himself corroborated Ramirez's testimony regarding the "Bullfrog" comment and subsequent conversations. (CT 505-507; RT 205-207). Witnesses Silva and Lopez confirmed that Ramirez was present for the shooting (RT 82, 215). And Ramirez's account of the shooting varies only slightly from that given by Petitioner. (CT 504-521). In addition, while the trial court did not instruct the jury on accomplice credibility, it did give other cautionary instructions regarding witness testimony.[3] Further, during closing arguments counsel for co-defendant Nevarez was able to argue that Ramirez was not a credible witness as a result of being intoxicated and because he had given conflicting statements to the police. (RT 1335, 1339-40). Given the corroboration of Ramirez' testimony, the additional instructions on witness credibility, and the jury's awareness of the potential credibility problems noted by co-defense counsel, the absence of accomplice instructions did not render Petitioner's conviction a complete miscarriage of justice.

### 5.     Conclusion

Petitioner has failed to demonstrate that the state court rejection of his claim was contrary to, or an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or a decision that was based on an unreasonable determination of the facts in light of the evidence presented. See 28 U.S.C. § 2254(d). Accordingly, this claim should be denied.

**RECOMMENDATION**

Accordingly, the Court HEREBY RECOMMENDS that the petition for writ of habeas corpus be DENIED and the Clerk of the Court be DIRECTED to enter judgment.

These Findings and Recommendations are submitted to the Honorable Lawrence J. O'Neill, United States District Court Judge, pursuant to the provisions of 28 U.S.C. section 636

---

[3] The trial court instructed the jury with CALJIC No. 2.21.1, which states that a witness who is willfully false in one material aspect of his testimony is to be distrusted in others. (CT 585). Use of other cautionary instructions regarding witnesses tends to show that the failure to give accomplice instructions was not prejudicial. See Williams v. Calderon, 48 F.Supp.2d 979, 1014-15 (C.D. Cal. 1998).

(b)(1)(B) and Rule 72-304 of the Local Rules of Practice for the United States District Court, Eastern District of California.

Within thirty (30) days after being served with a copy, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Replies to the objections shall be served and filed within ten (10) <u>court</u> days (plus three days if served by mail) after service of the objections. The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(c). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Y1st, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

**Dated:   July 17, 2007**                              /s/ John M. Dixon
                                                  UNITED STATES MAGISTRATE JUDGE